L. F. Long v. Commissioner.
Long v. Commissioner
Docket No. 3677.
United States Tax Court
1947 Tax Ct. Memo LEXIS 197; 6 T.C.M. (CCH) 614; T.C.M. (RIA) 47155; May 29, 1947
Harry C. Weeks, Esq., 909 Sinclair Bldg., Fort Worth, Tex., for the petitioner. John W. Alexander, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves deficiencies of $24,870.32 and $ 4,345.40 in income tax for the respective years 1940 and 1941. The issues still in controversy are the gain realized by petitioner in 1940 upon the disposition of part of his interest in the Joe Long Drilling Co.; whether such gain is taxable as capital gain, and whether an oil payment received in 1941 in the amount of $34,524.87 is separate income of petitioner or community income. Findings of Fact The petitioner married his first wife, Minnie Pearl Long, in 1923, and has been a resident of Texas continuously since 1931. *198 He prepared his returns on the cash basis and filed his returns for the taxable years with the collector at Dallas, Texas. At the time he moved to Texas petitioner owned a one-fourth interest in a partnership known as the Joe Long Drilling Co. In 1932 he increased his interest to one-third by purchase from another partner and petitioner continued to own such interest until the close of 1940. The other two-thirds interest was owned by Joe Long and Edith Long, petitioner's father and stepmother, respectively. Until his divorce on October 5, 1938, the petitioner's one-third interest in the partnership was community property belonging equally to him and his then wife under the laws of Texas. The chief asset of the partnership was the Owens leasehold, which was acquired in about 1933 and consisted of 300 acres located in Gregg County, Texas. It was divided into three different leases, known as A lease, covering 218 acres, B lease, covering 10 acres and C lease, covering 72 acres. Later, but before October 5, 1938, the partnership acquired one-fourth of the one-eighth royalty under the Owens B lease and three-fourths of the one-eighth royalty under the Owens C lease. On September 1, 1938, petitioner's *199 then wife filed a petition in the Special District Court of Gregg County, Texas, for a divorce from petitioner and custody of their four minor children, ranging from three to twelve years of age. On September 28, 1938, the petitioner and his then wife entered into a property settlement agreement. Preambles of the agreement recite that community property of the parties was involved in the litigation; that the parties had agreed upon a settlement of their interests therein, as set forth in the instrument, and that they also desired at that time to make provision for the support, education, custody and rearing of their four minor children born of their marriage. The petitioner agreed in the instrument, among other things: 1. To obtain life insurance on his wife for the payment of $ 100 monthly to her for life as trustee for the equal benefit of their four children until one of them reached the age of 21, when the beneficial interest of such child was to cease, and the remaining children should share equally in the interest until the last child reached 21 years of age, at which time the beneficial interest in the insurance was to vest in the wife, any cash or refund value in the insurance *200 at the time of her death to go to the children or their heirs at law, share and share alike. 2. To obtain a single premium insurance policy in the amount of $ 5,000 on the life of Minnie Pearl Long, their four children and their heirs to be named beneficiaries thereof. 3. To obtain, within two years after a decree of divorce was entered, two additional policies of insurance on the life of Minnie Pearl Long, each policy to pay to her for life not less than $ 90 and not more than $100 monthly, with their four children and their respective heirs named as beneficiaries of any funds payable on the policies at her death, and until such policies were taken out, to pay to her monthly the sum of $200, the amount to be reduced to $100 after the first policy was acquired. In case of petitioner's death before the policies were taken, his estate was to be liable for an amount necessary to purchase the policies, the monthly payments to continue until the policies were acquired. Petitioner was given an option during the period of two years of not purchasing either policy, and if exercised by him, the wife was to have and hold an undivided two-thirds of one-half interest in their community property, *201 and if he exercised the option as to only one policy, then she was to have an undivided interest in one-third of one-half of their community property. 4. That in the event of his wife's death within the two-year period and before the policies were taken out, to create a trust fund in an amount equal to what the policies would have cost, with the income therefrom to go equally to the children until the last surviving child reached the age of 21, when the trust was to terminate and the corpus be divided equally among the four children and their heirs; provided, however, that petitioner was to have the same option with respect thereto that he had as to the insurance policies and in lieu of the interest in community property vesting in his wife, it was to vest in the children and their heirs. 5. To place in trust, within six months after a decree of divorce was entered, the sum of $2,500 for the use of Minnie Pearl Long and the four children when in need of extra funds for their protection, the amount payable from the fund at any one time not to exceed $500. 6. That a new Buick automobile, then being driven by Minnie Pearl Long, should remain her property and be paid for by petitioner. *202 7. That the home occupied by them, including the furniture and household effects therein, should be the property of Minnie Pearl Long. Minnie Pearl Long agreed in the instrument, among other things, that in consideration of the premises set forth in the instrument and in the event she was granted a divorce, to transfer to petitioner all of her interest in their community property, subject, however, to the terms of the agreement and the retention of a lien on the property until the fulfillment by petitioner of his obligations to obtain the policies of insurance, but waiving, until default by petitioner of his obligations, any interest in oil or gas, or the proceeds thereof, accruing on the interest of petitioner in property that might be assigned by her. Both parties agreed that neither at that time had any separate property and that all of their property in Texas and elsewhere was their community property, including an undivided one-third interest in the partnership. The petitioner and Minnie Pearl Long were divorced on October 5, 1938, by a decree in which the plaintiff was given custody of the four minor children and the court found, after hearing evidence, that the property *203 settlement was fair, equitable and just. The first and second policies of insurance referred to above were acquired on October 5, 1938, and November 21, 1938, respectively, at a cost of $29,383 for the first one and $1,816.95 for the second one. The third policy was purchased October 31, 1939, at a cost of $26,895.30 and the fourth on August 9, 1940, at a cost of $26,644.50. In order to obtain the last two policies petitioner made bank loans of $10,000 on October 5, 1939, and $12,500 on August 6, 1940. In addition thereto, petitioner borrowed $2,100 from his father to pay on the cost of the first policy and the $5,000 policy and to make a deposit of $2,500 in trust, in compliance with the property settlement agreement. Petitioner received the income from the deposit of $2,500 and, in accordance with the terms of the agreement, paid $200 each month to Minnie Pearl Long until the third policy was taken out and $100 monthly thereafter until the fourth one was issued. The Buick automobile purchased new in August 1938, and the home, including the furnishings therein, which had cost petitioner $1,369.50 and $8,500, respectively, were transferred pursuant to terms of the property settlement. *204 In addition to this property, petitioner and his first wife owned as community property at the time of their divorce, a one-third interest in the partnership, onethird of the stock of the Cushing Drilling Co., a Texas corporation, which petitioner acquired without cost, about $12,000 cash on deposit in banks, an old Buick automobile, and 10 acres of land in California valued at $25. The Cushing Drilling Co. was organized to drill on the Ownens lease for the partnership. Petitioner and his father owned two-thirds of the corporation's stock. All of its tools and equipment were assigned to the partnership during the course of dissolution of the corporation as of December 18, 1940. On October 6, 1938, petitioner's first wife, as a feme sole, executed an instrument conveying to petitioner all of her interest in their community property, including the Owens leasehold, subject to a vendor's lien until petitioner performed all of the obligations assumed by him in the property settlement agreement. The lien was released by an instrument executed on August 21, 1940, by Minnie Pearl Long (then Minnie Pearl King, she having remarried before petitioner had complied with all the terms of the property *205 settlement agreement) and her husband. The instrument recited that petitioner had performed all of his obligations under the property settlement agreement. The petitioner remarried on August 10, 1939, and since then he and his wife have continuously resided together in Texas as husband and wife. At the time of petitioner's second marriage, 47 or 48 wells had been drilled on the Owens leasehold. At that time the leasehold property had a value of about $900,000. Thereafter, to the close of 1940, four more wells were drilled on the leasehold at a cost of about $10,000 each. The wells increased the value of the property and at the close of 1940 the leasehold and well and lease equipment had a fair market value of about $966,000. The gross receipts of the partnership from August 10, 1939, to the close of 1940, were about $300,000, most of which was derived from the Owens leasehold. No segregation was made by the partnership between receipts from the Owens leasehold and other income. On December 30, 1940, petitioner and his wife and his father and stepmother executed an agreement called "ASSIGNMENT OF OIL AND GAS LEASE," in which, after reciting that the Owens leasehold was then *206 owned by the partnership, composed of petitioner and his father and stepmother, and that petitioner, joined by his wife, "desires to withdraw from the partnership" and. "to dispose of his One-third (1/3) interest" in the Owens leasehold, subject to the reservation of an overriding royalty interest, petitioner and his wife "the present owners of a One-third (1/3) interest in the partnership, Joe Long Drilling Company, the owner" of the Owens leasehold, conveyed to Joe Long and his wife all of their right, title and interest "now owned by them in and to the said lease and all equipment and personal property located thereon and used in connection therewith" except "an undivided One-seventh (1/7) Over-riding Royalty interest in and to the Seven-eights (7/8) leasehold interest, which is equivalent to One-eighth (1/8) of the entire production," free and clear of all operating equipment, and development costs, limited, however, to $334,000, and covenanted that "they are the lawful owners of said interest in said lease and rights and interests thereunder, and of the personal property thereon or used in connection therewith; that the undersigned have good right and authority to sell and convey *207 the same * * *" On December 30, 1940, effective as of the close of business the next day, Joe Long and his wife, as partners of the Joe Long Drilling Co., executed an instrument called a "MINERAL DEED," conveying to petitioner (described in the instrument as a co-partner in the partnership of Joe Long Drilling Co.) all of the interest acquired by the Joe Long Drilling Co. in the Owens B lease. On the same day, effective as of the same time, they executed a like instrument in which they conveyed to petitioner one-sixth of the royalty interest of the Joe Long Drilling Co. in the Owens C lease. The grantors described themselves in the instruments as "now members of the co-partnership," and petitioner as "a co-partnership in the partnership, Joe Long Drilling Co." The latter instrument recites that prior to its execution, the grantors and grantee together owned three-fourths of the mineral rights and that the purpose of the instrument was to vest in petitioner a sufficient interest so that his ownership thereafter would be one-half of three-fourths of the royalty interest, and that the remaining like share would be owned in equal proportions by the grantors "who will continue operating *208 as Joe Long Drilling Company and receive payment for production from said royalty in the name of the partnership which will hereafter be composed of Joe Long and Edith Long, each owning an undivided one-half (1/2) interest." On December 31, 1940, Joe Long and his wife, described as "two of the partners of the Joe Long Drilling Company," executed an instrument described as a Bill of Sale, transferring to petitioner: "Our Two-thirds (2/3) interest in Drilling Tools and Drilling Equipment acquired December 28, 1940 from the Cushing Drilling Corporation by the Joe Long Drilling Company, a partnership, consisting of three members, namely Joe Long, Edith Long and L. F. Long, which partnership was dissolved on the 31st day of December 1940 by and as a result of one of its members L. F. Long withdrawing from the said partnership, said L. F. Long taking immediate possession of said Drilling Tools and Drilling Equipment." The four instruments executed at the close of 1940 were exchanged contemporaneously. No other instruments were executed in connection with the transaction. Negotiations for the transaction were conducted by petitioner with his father. At times petitioner was represented *209 by a broker, to whom he paid a commission of $2,800. The agreement reached by petitioner with his father resulted in the distribution to him in kind by the partnership of the overriding royalty, drilling tools and equipment, consisting of a drilling rig, and the Owens B and C royalty interests, as set forth above, in liquidation of such portion of his partnership interest, and the payment of $136,000 cash to petitioner by his father and stepmother and a note for $30,000 signed by Joe Long, for the remaining partnership interest of petitioner. During 1938, 1939, and 1940, the petitioner withdrew $20,374, $57,253 and $40,821.61 from the partnership. In his return for 1940, petitioner reported long-term capital gain of $107,945.32 from the sale of his one-third interest in the partnership based upon selling price of $167,800.47, cost of $57,055.15, and an expense of $2,800 for selling commission. One-half, or $26,986.33, of the gain to be taken into account, was included in the return as income from community property. In his determination of the deficiency the respondent held that petitioner realized gains, all taxable as separate income, from sales of assets acquired in the *210 dissolution of the partnership. He first placed fair market values totaling $1,015,955.78, on the partnership assets, assigning one-third of such values to petitioner as his share, and determined petitioner's cost in the property upon the basis of his interest in the partnership property allocable to the assets. Petitioner's share of such value of the assets and the costs so determined were then used as the sales prices and costs, respectively, to compute total gain of $47,905.93, taxable at ordinary rates, on six items of property classified as depreciable and inventoried assets, and long-term capital gain of $10,632.74 (limited to 50 per cent) on seven items of miscellaneous assets, including the Owens B and C royalties. The respondent determined long-term capital gain of $81,911.04 (limited to 50 per cent) on the sale of the Owens leasehold, the remaining asset, in this manner: Petitioner's share of fair
market value of all
assets
$338,651.92
Fair market value of
oil payment reserved
$167,000.00
Sales price of all assets
except leasehold
71,543.56
238,543.56
Sales price of leasehold
$100,108.36
Cost price of leasehold
[1] 18,197.32
Gain
$ 81,911.04
*211 In each instance petitioner was regarded by the respondent as having received the sales price in cash or its equivalent. The total sales price of $171,651.92 determined by the respondent was computed by the revenue agent as follows: Cash
$130,000.00
Notes
36,000.00
Equipment
1,800.47
Accounts payable
1,000.00
Bank overdraft
51.45
Owens B royalty
1,100.00
Owens C royalty
4,500.00
$174,451.92
Less commission paid
2,800.00
$171,651.92 Opinion After concessions made, which will be reflected in decision entered under Rule 50, the only questions left for our consideration are: (a) The nature and amount of gain in 1940 from transactions in connection with a partnership in December 1940, through which petitioner's connection therewith was terminated; and (b) whether petitioner's income, in 1941, from a separately owned overriding royalty right is separate or community income. Concerning the nature of the transaction in 1940, the contention of petitioner, upon brief, is that he received in kind from the partnership one-half of the Owens C royalty, all of the Owens B royalty, the overriding royalty interest and the drilling rig, and sold the remainder of his partnership interest at a gain. The contention of the respondent, upon brief, is that the assets of the partnership were distributed to the partners in a dissolution on December 30, 1940, and that thereafter in 1940 petitioner sold a portion of the assets to his father and stepmother, retaining the drilling rig, his royalty interests in the Owens B and C leases and an oil payment of $334,000. He admits that there is testimony tending to support the idea that petitioner sold his undivided onethird interest in the partnership. The respondent did not, when determining the deficiency, include the oil payment in his computation of gain from the sale and upon brief does not ask that it be included. The oil payment is disregarded by petitioner upon the ground that it was one of the assets received from the partnership in kind. Accordingly, there is agreement between the parties that the oil payment should not be included here as an asset disposed of in the transaction. The transaction resulted from negotiations conducted by petitioner himself, and through a broker representing him, with his father. The consideration finally agreed upon bears no direct relation to the value of petitioner's partnership interest, the opposite of what it would have been in an ordinary dissolution. This is also indicated by the fact the instruments executed do not cover numerous other partnership assets, or cover any liabilities. None of the instruments refer to the transaction as a dissolution in the ordinary sense in which each partner receives his proportionate share of the net assets of the business; rather, each instrument is a conveyance of a described asset and together they do not cover all of the property of the partnership. The documents were exchanged contemporaneously and disclose a plan effective at the close of 1940, not on December 30, 1940, as determined by respondent. This is definitely shown by the mineral deeds, executed on December 31, 1940, and the other two conveyances, which, by their terms, were not to be effective until the close of 1940. There was no complete liquidation of dissolution of the partnership; it continued to operate with the Owens leasehold as its chief asset and the remaining partners as the sole partners. To acquire the interest of petitioner, new capital was put into the venture by Joe Long and his capital investment thereafter as the owner of a one-half interest of the partnership differed from what it was before petitioner retired from the firm. The facts suggest no transaction to give each old partner only the equivalent of one-third of the value of his partnership interest. The petitioner testified on direct examination that the substance of the transaction was that for his interest in the partnership property, his father agreed to give him cash of $136,000, a note for $30,000, the overriding royalty, all of the Owens B and one-half of the Owens C royalties, and the drilling rig. Such cash and property were received by the petitioner. The cash and note were paid by Joe Long, and the other property was transferred by the partnership. The tangible property received by petitioner in the transaction was more than his one-third partnership interest therein, and respondent now admits that it and the overriding royalty were retained by petitioner. The effect of his admission, viewed in the light of his original theory of the nature of the transaction, is that the property was received in a dissolution, i.e., in kind. The parties are in accord that petitioner withdrew from the partnership, but it is apparent that all of the facts and conditions in connection with the withdrawal are not in evidence. For instance, except for the finding of the revenue agent, we are not aware of the disposition made of partnership liabilities; there is absence of written conveyances of petitioner's interest in certain leases held by the partnership and returns of petitioner for 1940 and 1941 disclose interests in leases of the same name as those held by the partnership. No doubt the lack of proof on the point is chargeable to dealings among members of a family group. However, there is enough proof to establish that the intent of the transaction was for the partnership to make distributions in kind, i.e., the overriding royalty, Owens B and C royalties and drilling rig, to petitioner for a portion of his partnership interest, and the sale of the remainder of his interest to petitioner's father for cash and a note, aggregating $166,000, and that such intention was consummated. Due, in part to their disagreement on the nature of the transaction, the parties differ on the sales price of what was sold and the cost thereof. The petitioner contends that the proper net selling figure was $166,000, the total of the cash and note received, less a selling commission of $2,800, against which should be applied a basis of $116,140.09, consisting of $30,779.39, or one-half of $61,558.78, being the partnership basis allocated by respondent to petitioner's one-third interest therein, plus $85,360.70 as cost in acquiring the interest of his first wife in his partnership interest. The respondent, notwithstanding some alteration of the theory he had of the transaction when determining the deficiency, adheres to the conclusion then reached that the sales price was $171,651.92, [1] this amount being one-third of the fair market value of the assets of the partnership, as determined by him, less $167,000 as the fair market value of the oil payment. The amount includes $6,500.24 as the selling price of the drilling rig and Owens lease royalties. These assets were received in kind in petitioner's withdrawal from the partnership, and as they were retained by petitioner, the gain or loss as to them must be deferred until disposed of by petitioner. ; . *212 The only property sold by petitioner was so much of his partnership interest as was left after he received the distributions in kind. For such interest he received cash of $136,000 and a note for $30,000 (petitioner makes no contention that the note was not worth its face amount), a total of $166,000, which we hold to be the correct selling price for the interest. The respondent contends, upon brief, that he correctly computed cost in the amount of $31,202.21, being $61,558.78, an amount equal to the partnership basis allocable to petitioner's one-third interest, less $30,356.57, as the basis for the oil payment. The petitioner computes his basis of $116,140.09 in the following manner: Cost policy purchased on
October 31, 1939
$26,895.30
Cost policy purchased on
August 9, 1940
26,644.50
Payments to wife pend-
ing purchase of the
policies
3,400.00
$56,939.80
One-half of cost of
$61,558.78 of interest in
partnership as com-
puted by respondent
30,779.39
Other costs [one-half of
$56,939.80]
28,469.90
[1] $116,189.09
*213 The theory of petitioner is that he purchased his first wife's interest in the community assets and that the amount thereof allocable to the partnership interest should be added to his original community basis, citing . The reasoning for petitioner's method of arriving at the additional cost is, in substance, that since under the property settlement agreement his first wife was to retain a two-thirds of one-half interest in the property in the event either of the third and fourth policies were not acquired, the cost of such policies, plus the monthly payments made before the policies were acquired, a total of $56,939.80 constitutes the purchase price for the two-thirds of his first wife's one-half interest in his partnership interest, and that of the remaining amount of $38,634.20 [correct total is $38,634.70] paid, $28,469.90 is the cost of the other one-third interest in the partnership interest and the remainder for other community assets. The $56,939.80 is asserted by petitioner to be the value the parties placed upon two-thirds *214 of the first wife's one-half interest in his partnership interest. The property settlement agreement entered into contingent upon the wife obtaining a divorce, upon the terms of which the petitioner relies to support his claim of a purchase of the assets, shows a transaction other than a purchase and sale. After reciting the pending divorce suit, the agreement sets forth that the parties had agreed upon "the following settlement of their respective rights, titles and interest" in their community property and that they desired to make provision for the support, education, custody and rearing of their children. The agreement contains no list or valuation of the community property or a figure to be paid by petitioner for the interest of his wife, such as was present in the Rouse case, supra, which indicates no bargaining or an agreement based upon an agreed value for community property. The instrument contains much to establish that its primary function was to make provision for the welfare of the children, and a settlement of community property interests only incidental thereto. The insurance policies represent most of the additional cost claimed by petitioner. The first one was *215 held by the first wife as trustee for the benefit of the children until, in general, they reached 21 years of age and upon her death, they were to receive its cost or refund value. Thus the wife's sole enjoyment of the policy, paying $100 monthly, was limited to her lifetime after the children reached maturity. The wife could not derive any financial benefit from the second policy, it being a single premium policy payable to the children upon her death. The provisions for the third and fourth policies contain no limitation upon the use of the monthly payments of $180 to $200, but require that the children be beneficiaries of the value of the policies upon the death of the annuitant. That some part of the monthly payments was to be used for the support of the children is indicated by another provision of the settlement agreement requiring petitioner, in case the wife died within two years after obtaining a divorce, and before the policies were purchased, to use the money that would have been used to acquire the insurance for the creation of a trust fund for the benefit of the children until the last one reached the age of 21, when the corpus was to go to the children. The trust fund *216 of $2,500 was for the benefit of the wife and children, and the balance therein, if any, at the death of the former, was to go to the latter. Since the wife was to have custody of the children, it is apparent that the home and its furnishings were intended as provision for their support. Thus, substantially all of the consideration paid by the petitioner was intended for the support of the children during their minority, and a large part of it for their enjoyment of the residue upon the death of the wife. The provision made for the support of the children was recognition of the primary legal duty of petitioner to care for them even though the care and custody were awarded to the mother in a divorce proceeding. (Texas). Petitioner agrees that such a duty existed. While petitioner says upon brief that if his first wife chose to sell her property to obtain money for the support of their children, a sale occurs, we do not understand that he regards the settlement made as a discharge of his legal duty to supply the primary support of the children. The facts do not support a finding that she disposed of her interest in the community *217 property to obtain funds with which to comply with such legal duty as she had to support them. The fact that the wife was to have a two-thirds interest in one-half of the community property in the event petitioner failed to take out either of the third and fourth policies and one-half thereof if he purchased one of them, does not indicate a sale, particularly does not indicate that the cost of the two policies constituted an agreed purchase of her community interest in the partnership interest, and that it would follow that of the alleged remaining consideration, an amount equal to one-half of the cost of such policies, was for the other interest in the partnership. The right reserved by the wife to retain a two-thirds interest, in case petitioner failed to obtain the policies, applied to all of the community property, including the partnership interest. Under the petitioner's theory, the cost of his wife's interest in community property, other than the partnership interest, was $10,164.80. Such other property had a value of about $12,000, not including any value for stock of the Cushing Drilling Co. and an old Buick automobile. Such a cost for an interest in property having a proven *218 value of only about one-half thereof is opposed to the idea of a sale on the basis of actual value. The wife transferred her interest in the community property on October 6, 1938, but reserved a vendor's lien until petitioner had complied with his contract obligations. We do not consider that the reservation of a "vendor's lien" proves that the wife was a vendor. The obvious purpose of the reservation of rights by the wife was to secure faithful performance by petitioner of the obligations he assumed in the contract. In the Rouse case, supra, the parties, in an arm's length transaction, agreed upon the value of the community property and the husband obligated himself to pay a specified amount for the wife's interest therein. The evidence here does not support a finding that the community interest of the wife was acquired by petitioner in a sale, it being no more than proof of a partition of community property, without regard to actual value thereof, primarily to insure funds for support of the children. The importance of the childrens' interest in the matter is logical explanation why division is not on an equal basis. Moreover, even if we assumed that the transaction with the wife *219 involved purchase of her interest, it is apparent that it also involved, in large part, provision for the children, so that the consideration from the petitioner would be for both elements; and since there is nothing in the record from which (even on the theory of ) we might allocate the consideration between purchase of the wife's property and provision for the children, for this additional reason we can not add anything to petitioner's base because of the transaction. We do not agree with the petitioner that the purpose was accomplished by sale and purchase. That, at the most, was only a part of the purpose. The total amount of $61,558.78 determined by the respondent as the petitioner's basis for his entire partnership interest (before deducting $30,356.57 as basis for the oil payment) includes $163.64, $199.95 and $817.99, a total of $1,181.58, as the amounts thereof allocable to the drilling rig, Owens B and Owens C royalties, respectively. The total figure of $61,558.78 is reflected in the petitioner's contention of cost as a correct finding of basis for the whole partnership interest. Notwithdtanding the agreement of the *220 parties on the cost basis for the partnership interest, since the royalties and drilling rig were not included in the sale, the cost of the partnership interest sold by petitioner should be reduced by $1,181.58 included by respondent for retained assets. Except for such adjustment, the cost determined by the respondent is sustained. In addition to such cost, the petitioner is entitled to a deduction of $2,800 from the selling price for the fee he paid to his broker. The petitioner now concedes that the gain from the sale is taxable as separate income. The remaining point under the issue is whether the profit is taxable as long-term capital gain. Under his theory that specified articles of property were sold, respondent taxed the gain on depreciable and inventoried assets at ordinary rates and the profit on other assets, as long-term capital gain. We have held that the petitioner sold his partnership interest, not items of partnership property. A partnership interest is a capital asset. ; . The petitioner *221 held the interest for eight years and accordingly, only 50 per cent of the gain should be taken into account in computing the tax. Section 117 (b), Revenue Act of 1938. The remaining question is whether the income of $34,524.87 received in 1941 under the overriding royalty interest acquired by petitioner when withdrawing from the partnership is separate income, as determined by the respondent, or community income, as contended upon brief by the petitioner. The amount is not in dispute and petitioner admits that the royalty or oil payment interest was his separate property. It is well settled that under Texas law oil royalty income derived from separate property is taxable as separate income to the spouse owning the interest, the basis for the rule being that the Texas courts treat oil royalties, not as rents or profits, but as proceeds of sale of realty, which for Federal income taxes are made ordinary income. ; ; ; affd. ; ; *222 , (409). The interest petitioner had in oil was something different from what he had when the partnership owned all of the lease. As a partner, petitioner had no interest in partnership assets as such. His ownership of the oil payment, however, was free of any claim of his former partners, something detached, for tax purposes, from the intangible interest he once had in the lease as a partner. Under the circumstances, the oil payment is not an unconveyed interest of petitioner in the leasehold, for as a partner he had no interest in it as such. The petitioner cites , to support his position. That case involved the income of a beneficiary from spendthrift trusts of personal property. Although in that case the court remarked that the "generally prevailing rule in Texas" was "that income from separate property falls when received into the community," we do not interpret it to mean that the Wilson and Crabb cases, supra, decided by the same court, no longer govern oil royalties. The petitioner indicates, without discussion of the point, or citation of authority, that a distinction *223 should be made between an oil payment and an overriding royalty. We fail to see any real distinction here. The partners, who executed the instrument under the terms of which petitioner acquired the interest, described the property as "an undivided One-seventh (1/7) Over-riding Royalty Interest in and to the Seven-eighths (7/8) leasehold interest, which is equivalent to One-eighth (1/8) of the entire production," limited, however, to $334,000. An oil payment is an economic interest in oil in place. ; . The petitioner so admits. Receipts of oil payments and from royalties result from an income-producing operation, not a conversion of capital, and the cost thereof is recoverable by allowances for depletion. ; . The Lee case, in which the court overruled a contrary result reached by it in , recognized an administrative and judicial *224 change from the action of that case, in distinguishing an oil payment from an oil royalty for cost recovery purposes, and identified royalties and oil payments as to cost recovery. We fail to see any distinction in regard to the question here, and, accordingly, sustain the respondent's action. Decision will be entered under Rule 50. Footnotes
1. This amount was computed as follows: ↩
Consideration
Percentage
Costs
Cash
$100,108.36
37.4786
$18,197.32
Oil payment
167,000.00
62.5214
30,356.57
1. The revenue agent determined a like amount, represented by the cash and the note actually received, plus amounts for fair market values of the drilling rig, royalties and accounts payable, and a bank overdraft, alleged to have been assumed by the buyers, a total of $ 174,451.92, less $ 2,800 for commission paid.↩
1. The difference between the amount and $ 116,140.09 is due to error in petitioner's statement of the total.↩